# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>W.J. BRADLEY MORTGAGE CAPITAL, LLC, *et. al.*,<br><br>                  Debtors. | C.A. No. 24-262-MN |
| GEORGE L. MILLER, Chapter 7 Trustee for the jointly administered Chapter 7 bankruptcy estates of W.J. Bradley Company Merchant Partners 2003-SEED, LLC, W.J. Bradley Mortgage Capital, LLC, W.J. Bradley Corporate Services, LLC, W.J. Bradley Financial Services, LLC, and WJB Mortgage Services, LLC,<br><br>                  Plaintiff,<br>                  v.<br><br>WILLIAM J. BRADLEY, JOSEPH A. CAMBI, ARTHUR S. DEMOULAS, GERARD LEVINS, AUDREY KIRDAR, DANIEL BARUCH, HOWARD MICHALSKI, ASD MERCHANT PARTNERS LLC, SPRINGFIELD CAPITAL, LLC, ARTHUR S. DEMOULAS CONTINUATION TRUST, ARTHUR S. DEMOULAS 2012 TRUST and PETER PICKNELLY,<br><br>                  Defendants. | |

**DEMOULAS DEFENDANTS OPENING BRIEF IN SUPPORT OF THEIR MOTION TO EXCLUDE THE TRUSTEE'S EXPERT FROM TESTIFYING AT TRIAL**

**DAVIS, MALM & D'AGOSTINE, P.C.**
Gary S. Matsko (admitted *pro hac vice*)
Christopher J. Marino (admitted *pro hac vice*)
Taylor P. Lovejoy (admitted *pro hac vice*)
One Boston Place, 37th Floor
Boston, MA 02108
(617) 367-2500
gmatsko@davismalm.com
cmarino@davismalm.com
tlovejoy@davismalm.com

Dated:  May 13, 2024

**YOUNG CONAWAY STARGATT
     & TAYLOR, LLP**
Michael S. Neiburg (No. 5275)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302)576-3590
mneiburg@ycst.com
rvrana@ycst.com

*Counsel for Arthur S. DeMoulas, ASD
Merchant Partners LLC, Arthur S. DeMoulas
Continuation Trust, and Arthur S. DeMoulas
2012 Trust*

## <u>TABLE OF CONTENTS</u>

**Page**

I.   NATURE AND STAGE OF PROCEEDINGS ..................................................................1

II.  SUMMARY OF THE ARGUMENT .........................................................................1

III. STATEMENT OF THE FACTS .............................................................................3

    A.  Underlying Facts Of The Case............................................................................3

        The Emergence of the Redemption...........................................................................4

        The Redemption And Recapitalization Transactions ...........................................5

        Unanticipated Post Closing Events .........................................................................7

    B.  Glusman's Opinion and Testimony ....................................................................8

IV.  ARGUMENT ..............................................................................................11

    A.  The Court Should Use its Gatekeeper Function to Exclude Glusman's Testimony..........11

    B.  The Glusman Opinion Does Not Satisfy The Fit Requirement As It Speaks As Of
        The Wrong Date..........................................................................................12

    C.  Counsel's Direction that Glusman Should Presume An Improper Legal
        Conclusion Makes Glusman's Opinion Irrelevant............................................14

    D.  Glusman's Testimony Established He Could Not Characterize MIMS' Investment
        As Debt On Accounting Principles..................................................................15

    E.  Glusman's Balance Sheet Analysis Is Rendered Unreliable by Methodology
        Flaws.........................................................................................................17

V.   CONCLUSION.............................................................................................20

## <u>TABLE OF AUTHORITIES</u>

CASES                                                                                    Page(s)

*In re Am. Classic Voyages Co.*,
    2007 WL 1237828 (Bankr. D. Del. Apr. 27, 2007).................................................................18

*Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC*,
    No. 13-CV-324 (RGA), 2017 WL 3528606 (D. Del. Aug. 16, 2017)....................................11

*In re Autobacs Strauss, Inc.*,
    473 B.R. 524 (Bankr. D. Del. 2012) .....................................................................................12

*In re Bellanca Aircraft Corp.*,
    56 B.R. 339 (D. Minn. 1985)................................................................................................18

*Boyer v. Crown Stock Distrib., Inc.*,
    587 F.3d 787 (7th Cir. 2009) ...............................................................................................12

*Daubert v. Merrell Dow Pharm., Inc.*
    509 U.S. 579 (1993)....................................................................................................*passim*

*Exela Pharma Scis., LLC v. Eton Pharms., Inc.*,
    No. 20-CV-365 (MN), 2022 WL 806524 (D. Del. Feb. 8, 2022)..........................................14

*Hebert v. Lisle Corp.*,
    99 F.3d 1109 (Fed. Cir. 1996).............................................................................................14

*In re Indus. Com. Elec., Inc.*,
    No. 02-45451-JBR, 2004 WL 1354530 (Bankr. D. Mass. Apr. 27, 2004)............................12

*Janssen v. Reschke*,
    2020 WL 6044284 (N.D. Ill. Oct. 13, 2020)........................................................................12

*In re Kaylor Equip. & Rental, Inc.*,
    56 B.R. 58 (Bankr. E.D. Tenn. 1985) ..................................................................................13

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
    387 F. Supp. 2d 794 (N.D. Ill. 2005) ..................................................................................15

*Meadows v. Anchor Longwall and Rebuild, Inc.*,
    306 F. App'x 781 (3d Cir. 2009) .........................................................................................17

*Mellon Bank, N.A. v. Metro Comms., Inc.*,
    945 F.2d 635 (3d Cir. 1991).................................................................................................13

*Moody v. Sec. Pac. Bus. Credit, Inc.*,
    971 F.2d 1056 (3d Cir. 1992)..........................................................................................18, 19

ii

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir, 1994) ...................................................................................13, 17

*In re R.M.L., Inc.*,
   92 F.3d 139 (3d Cir. 1996) ............................................................................................12

*Roth Steel Tube Co. v. Comm'r*,
   800 F.2d 625 (6th Cir. 1986) ..................................................................................15, 16

*Southard v. United Reg'l Health Care Sys., Inc.*,
   2008 WL 4489692 (N.D. Tex. Aug. 5, 2008) ................................................................15

*Sprint Commc'ns Co. L.P. v. Cox Commc'ns Inc.*,
   302 F. Supp. 3d 597 (D. Del. 2017) ..............................................................................14

*In re SubMicron Sys. Corp.*,
   432 F.3d 448 (3d Cir. 2006) ....................................................................................14, 15

*In re Taxman Clothing Co.*,
   905 F.2d 166 (7th Cir. 1990) .........................................................................................18

*In re Trans World Airlines, Inc.*,
   134 F.3d 188 (3d Cir. 1998) ..........................................................................................18

*U.S. v. Ford*,
   481 F.3d 215 (3d Cir. 2007) ..........................................................................................13

*United States v. Cunningham*,
   679 F.3d 355 (6th Cir. 2012) .........................................................................................14

*In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*,
   858 F.3d 787 (3d Cir. 2017) ....................................................................................17, 19

**STATUTES**

6 Del. C. §§ 1304, 1305 ......................................................................................................1, 12

11 U.S.C. § 548(a)(1) .................................................................................................................1

**RULES**

Fed. R. Evid. 702 ........................................................................................................11, 15, 20

## I.       NATURE AND STAGE OF PROCEEDINGS

George L. Miller, the Chapter 7 Trustee (the "Trustee") for W.J. Bradley Merchant Partners 2003 Seed LLC and affiliated entities ("WJB'), brings this case against defendants Arthur S. DeMoulas, Arthur S. DeMoulas Continuation Trust and Arthur S. DeMoulas 2012 Trust ("collectively DeMoulas") alleging WJB's redemption of DeMoulas' WJB membership interests (the "Redemption") should be set aside as a fraudulent conveyance under 11 U.S.C. § 548(a)(1)(A), 11 U.S.C. § 548(a)(1)(B), and 6 Del. C. §§ 1304 and 1305.

To prove its constructive fraudulent conveyance claim, the Trustee must show WJB was insolvent on the date of the Redemption and less than fair equivalent value was exchanged.[1]  To do so, the Trustee retained David Glusman, CPA ("Glusman") as an expert to provide an opinion of insolvency.  The Trustee provided DeMoulas with Glusman's expert report and a rebuttal report. Glusman was deposed on January 25, 2024.  Based on Glusman's two reports and his deposition, DeMoulas now moves to exclude Glusman from testifying at trial on *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579 (1993) and Fed. R. Evid. ("FRE") 702 grounds.

## II.      SUMMARY OF THE ARGUMENT

1.      A party seeking to establish a constructively fraudulent conveyance must establish insolvency on the date of the challenged transaction which, in this case, is December 9, 2015. Instead, Glusman opined WJB was insolvent on December 31, 2015.  While decisional law recognizes insolvency on the date of a transaction can be proven by establishing insolvency at a later date, that is proper only if the proponent can demonstrate no material changes occurred between the dates.  Glusman not only failed to establish no material change between the dates but,

---

[1] While the Trustee may also pursue a theory of intentional fraud, this theory is not relevant to the current motion.

1

to the contrary, acknowledged the financial condition of WJB deteriorated between December 9, 2015, and December 31, 2015, and that he made no effort to quantify the magnitude of that deterioration. Because of this failure, his testimony does not speak to solvency on December 9, 2015 and should be excluded as not meeting the "fit" requirement of *Daubert*.

2.      Glusman's opinion should be excluded because he only reaches the conclusion WJB was insolvent on December 31, 2015, by relying on an incorrect legal presumption. The Redemption was conducted as part of WJB's recapitalization in which it received $44 million (the "Recapitalization Transactions"), including a $10,000,000 limited partnership investment from MIMS Master Fund LP ("MIMS") recorded on WJB's books as an equity investment. At the direction of counsel, Glusman recharacterized MIMS' investment as debt as a matter of law. Third Circuit precedent is clear that whether an investment is debt or equity is an issue of fact, not law. Without recharacterizing MIMS' investment as debt, Glusman's analysis would show WJB was solvent on December 31, 2015 (which, as described above, is the wrong date). Because Glusman's opinion is founded on an improper assumption that the $10 million MIMS investment is debt as opposed to equity, his opinion is neither fit nor reliable.

3.      If Glusman attempts to offer an expert opinion on the factual question of whether MIMS' investment should be recharacterized as debt, his deposition testimony revealed that he mischaracterized the limited partnership documents in a manner that wrongly attributed to the MIMS investment characteristics of debt it did not have. Accordingly, any opinion Glusman offers as to the character of the investment is not reliable.

4.      Glusman's opinion should be excluded because it is unreliable as he failed to follow the established methodology for performing an insolvency analysis. Glusman's insolvency

analysis is based on the balance sheet test.  It is black letter law that in doing a balance sheet test the expert is to use a going concern premise of value (which would include goodwill) unless it is clear the debtor was "on its death bed" at the time of the transaction.  Ignoring the established methodology and compelling evidence that WJB was not on its "death bed", Glusman improperly employed a liquidation premise of value (which would not include goodwill) in reliance on a document he characterized as an accurate set of "cash flow projections."  The document was not a set of contemporaneous cash flow projections, but an Excel working file with draft estimates and dummy entries and contained an obvious error that projected $50 million in annual future expenses that were repeated in error.  During his deposition, Glusman quickly acknowledged the substantial error in the document and that recognizing the error earlier would have led to different conclusions. Because he used an incorrect methodology and relied on an erroneous document, Glusman's balance sheet test is itself unreliable and his testimony should be excluded.

## III.     STATEMENT OF THE FACTS

### A.  Underlying Facts Of The Case.

WJB was formed in 2003 by William Bradley ("Bradley") and Joseph Cambi ("Cambi"), to engage in the business of mortgage loan origination.  Compl. ¶ 21. DeMoulas became an investor in WJB in 2008 (*id.*) and over the next several years invested additional funds until his investments in the company totaled approximately $25 million.  DeMoulas ultimately owned over 65% of WJB.  Ex. 2, p. 23; Ex. 3, p. 4 (DEF 003972).[2]

WJB's business model was to borrow money from "warehouse lenders" and loan those funds to retail borrowers for residential loans.  The loans from the warehouse lenders were short

---

[2] Citations labeled herein as "Ex. [  ]" are to the corresponding exhibits to the Declaration of Robert M. Vrana in Support of DeMoulas Defendants' Opening Brief in Support of Motion to Exclude.

term, generally 90 days or less.  To pay back the warehouse lenders and harvest its profits, WJB packaged the loans and sold them to quasi-governmental agency purchasers[3] or private banks.  Ex. 1, pp. 138-141.  WJB's success depended on promptly reselling the loans it made.  If it did not quickly sell off the loans and repay the warehouse lenders, it would be subject to "curtailment" which meant it had to pay all or part of the loan to the warehouse lender before getting funds from the resale of the loans.  In that event, WJB could have to use operational funds to address curtailment obligations which could seriously affect WJB's cash flow and ability to do business.[4] Ex. 1, pp. 146-149.  Prior to early 2016, WJB managed to resell loans promptly so that curtailment did not become a significant issue.  Ex. 1, pp. 71-72, 149, 235-236.

### The Emergence of the Redemption

By 2014, DeMoulas was interested in withdrawing from WJB, and when earlier transactions to buy out his interest failed, in March 2015, Cambi's entity Springfield Capital Corporation ("SCC") entered into an agreement to purchase DeMoulas' shares for $25,000,000. Ex. 4, pp. 34-35, 46-47, 50-51.  Cambi and Bradley thought it was not a good situation for WJB to have a controlling shareholder who wanted to disengage so they believed it was important to accommodate Arthur's desire to withdraw.  Ex. 4, pp. 49-50.[5]  They also learned, as they

---

[3] These organization would include Federal Home Loan Mortgage Corporation ("Freddie Mac"), the Government National Mortgage Association ("Ginnie Mae") and Federal National Mortgage Association ("Fannie Mae").

[4] WJB also acquired and either kept or resold servicing rights.  Servicing rights, which allow the holder to administer the loans in exchange for a percentage of the interest payments, are quite valuable, and generated profits for WJB whether they held or resold them. *See* Ex. 1, pp. 149-153.

[5] There were a number of communications during the effort to complete the Redemption in which Bradley and Cambi expressed anger towards DeMoulas. The Trustee maintains their anger drove the Redemption.  In depositions, which occurred well after the Trustee's initial claims against them were settled and released, each of Bradley and Cambi attributed the tone of those exchanges to the heat of the moment.  *See* Ex. 1, pp. 93-96; Ex. 4, pp. 74-76. Whatever may be said of those

negotiated with potential investors and partners in 2015, investors preferred to invest directly into WJB rather than fund an SCC acquisition that would swap one equity investor for another. Ex. 1, pp. 55-57. Because of that, the transaction evolved into the Redemption. *Id.*; *see also* Ex. 1, pp. 178-180.

### The Redemption And Recapitalization Transactions

When the transaction became a Redemption, WJB went about recapitalizing so it would bring into its coffers sufficient funds both to pay the Redemption price and to continue its business expansion. Ex. 1, pp. 115-117, 199-200. The Recapitalization Transactions included:

- Towne Mortgage Company ("Towne") agreed to provide $12,500,000 in funding. A portion of those funds were to be used to retire an outstanding indebtedness. Approximately $7,500,000 was to be available for the Redemption. Ex. 5, pp. 1-2; Ex. 1, pp. 116-17.

- Ellington Management Group ("Ellington") agreed to provide approximately $12,500,000 of which $2,500,000 could be used for the Redemption and the balance to be used for working capital. Ex. 5, p. 2; Ex. 1, pp. 116-17.

- MIMS made a $10,000,000 investment into a partnership that was a subsidiary of WJB. Ex. 5, p. 2, Ex. 1, pp. 116-17.

- SCC made a $9,000,000 investment of capital that was paid directly to Demoulas as part of the Redemption purchase price. Ex. 5, p. 2; Ex. 4, p. 157.[6]

---

communications, it can hardly be doubted that having a disengaged controlling owner is not good for a closely held business.

[6] Glusman stated in his Initial Report that the transaction structure set forth in this document closely resembled the transactions that closed on December 9, 2015. Ex. 14, ¶ 17.

In total, the Recapitalization Transactions provided access to approximately $19 million beyond the $25 million to be used for the Redemption.  Ex. 5, pp. 1-2; Ex. 1, pp. 196-198; Ex. 11, pp. 89-91; Ex. 4, pp. 157-158.  Before making these commitments of funds, each of the above investors or lenders, all sophisticated entities with mortgage industry experience[7], conducted detailed and thorough due diligence.  *See* Ex. 6, p. 62.[8]  All of the parties to the Recapitalization Transactions were aware of the other related transactions.  Ex. 1, pp. 223-224; Ex. 6, p. 68.

The four disinterested directors of WJB approved the Redemption and Recapitalization Transactions.  DeMoulas recused himself from those votes.  Ex. 2, p. 83; Ex. 27, p. 1.  The Redemption and Recapitalization Transactions closed simultaneously on December 9, 2015.

The details of the MIMS transaction are critical to this motion.  Prior to the closing date, MIMS and WJB established two partnerships, WJB Loan, LP and WJB TBA, LP.  In both, WJB was the general partner and MIMS was the limited partner.  WJB Loan was set up to invest in mortgage loans by receiving a participation interest in loans originated by WJB.  The partnership would receive a return of invested funds plus a percentage of the profits generated by the sale of the mortgage loans in which the partnership had a participation interest.  WJB TBA was set up to engage in investments to hedge the mortgage investments.  Ex. 8, p. 184.  MIMS paid $10,000,000 to WJB Loan LP to acquire its partnership interest in December 2015.  Of that sum, $4,400,000 was paid on December 9, 2015 and the balance later in December.  Under the partnership agreement, MIMS was dependent on the success of the partnership to receive back its invested funds and any return on its investment, the quintessential feature of an equity investment.  Ex. 8,

---

[7] Ellington was a multi-billion-dollar hedge fund active in buying and trading mortgage loans, including from WJB. Towne was a mortgage originator focused on purchasing mortgage servicing rights. MIMS was an offshoot of Countrywide Bank of Manhattan. All three were sophisticated players in the mortgage world. Ex. 1, pp. 181-183; Ex. 4, pp. 155-156.
[8] William Homony testified as the Trustee's 30(b)(6) witness.

pp. 194-195; Ex. 9, pp. 23-24    MIMS did not receive a promissory note, did not have an unconditional promise of repayment, did not have a date certain for receipt of funds, did not have a promised interest rate, nor security, nor any other trait of a debt investment.  Ex. 8, pp. 186-187, 197-202, 205-207; *see generally* Ex. 9.

### *Unanticipated Post Closing Events*

Having completed the Redemption and the Recapitalization Transactions, WJB was optimistic about its future.  Ex. 10; Ex. 11, pp. 99, 106-107.  WJB forecasted the increased capital from the Recapitalization Transactions would allow it to grow its business.  Ex. 10, p. 1.  Indeed, shortly after redeeming DeMoulas' shares, WJB acquired a residential mortgage brokerage business in Texas projected to generate $50 million a month in mortgage volume and had plans to bring on other new branches in Florida, Los Angeles and New England in early 2016.  Ex. 10.

While WJB expected great things post-closing, two unanticipated events had a major impact on its business.  In early January 2016, "…about 30-40% of the Company's revenue was lost when [a mortgage brokerage business] left WJB for a competitor. This was completely unexpected by the Company."  Ex 12, p. 3; Ex. 1, pp. 253-256; Ex. 8, pp. 96-100.  WJB also encountered unexpected delays in being able to resell its mortgages because of the market's reaction to a regulatory change.

In October of 2015, new regulations that governed the mortgage industry known as TRID[9] took effect.  WJB was fully prepared for the TRID regulations but did not anticipate the impact TRID would have on the market for reselling its loans.  Because of ambiguities in the new TRID law and the harsh penalties imposed on violations, the entities who purchased WJB's repackaged

---

[9] TRID is an acronym for TILA-RESPA Integrated Disclosure, which was a combination of two prior laws that regulated the origination of residential loans.

mortgages dramatically slowed down the process by which they purchased loans. Ex. 1, pp. 238-240. Before 2016, banks would complete purchases in an average of 30 days. Starting in early 2016, that time period stretched to 90 days and more and, because of regulatory concerns, banks declined to purchase loans that in prior years they would have accepted. Ex. 1, pp. 239-240; Ex. 13. The delays and higher levels of rejection resulted in WJB not having funds to make timely payments to its warehouse lender and in substantial sums of cash being tied up by curtailment. Ex. 1, pp. 239-240, 243-245. The TRID slowdown, coupled with the loss of a large part of its revenue generating capacity, caused WJB to close its doors in March of 2016 and file a petition in bankruptcy in April of that year. Ex. 1, pp. 66-68, 240, 256-257.

## B. Glusman's Opinion and Testimony

There are three generally recognized tests applied to determine insolvency: (a) the balance sheet test; (b) the ability to pay test; and (c) the capital adequacy test. Ex. 8, pp. 83-86. Glusman did only the balance sheet test which looks at a debtor's balance sheet, adjusted to fair value and determines if assets exceed liabilities. Ex. 8, pp. 86-88. He did so as of December 31, 2015 instead of the December 9, 2015 date of the Redemption. Ex. 8, pp. 69-70. Glusman testified he picked that date because it was the closest date for which he had good documentation. Ex. 8, pp. 69-70.[10] Despite that assertion, a balance sheet and supporting information existed on November 30, 2015. Ex. 8, pp. 213-214 (acknowledging and explaining WJB financials through end of November 2015). Glusman made no effort to establish his conclusion regarding WJB's financial condition as of December 31, 2015 was representative of its condition on December 9, 2015. Ex. 8, p. 71.

In performing his engagement, Glusman was directed by Trustee's counsel to assume MIMS' investment in WJB's subsidiary was debt instead of equity, even though it was carried on

---

[10] *See also* Ex. 14, ¶¶ 22, 46, 47, 61, 62, 130.

WJB's books as equity.  Glusman's Initial Report defines his assignment as "analyz[ing] the solvency of the company contemporaneously with and following the redemption… assuming the funds advanced from MIMS…is a debt instrument."  Ex. 14, ¶ 8; Ex. 8, p. 47.  While Glusman tried to create an accounting justification for the directive[11], the record is clear that the assessment as to whether the investment was debt or equity was taken away from him by Trustee's counsel.  Counsel's instruction added $10,000,000 of debt to the balance sheet and created the appearance that a company that was solvent by a wide margin, was instead insolvent.  Ex. 8, pp. 60-61.  The purported accounting justifications were window dressing because, as Glusman admitted, "…at the end that was [counsel's] direction."  Ex. 8, p. 49.

In performing his balance sheet analysis, Glusman employed the liquidation premise of value.  That is, he valued the assets of WJB as if it were a "going out of business sale", rather than sale by a going concern which would include all the value from the future economic benefits associated with the continued operation of the business, such as goodwill.  A liquidation premise of value assumes a business's assets are sold either through an orderly or forced liquidation process, the latter resulting in a lower selling price *ceteris paribus*.  *See* Ex. 15, pp. 4-5.  A liquidation premise of value is not used absent evidence the company on its "deathbed" or liquidation was "clearly imminent" on the measurement date.  *Id*.

Glusman's use of a liquidation premise, despite strong evidence that as of December 9, 2015 (and even 12/31/15) WJB was a going concern, led to an improper and depressed valuation.  First and most compelling, on the very day of the Redemption, four sophisticated parties with deep

---

[11] As will be discussed below, in his deposition testimony, Glusman repeatedly acknowledged that the MIMS transaction documents had features that indicated the investment was equity and that several of the predicate assumptions he made about the transaction documents to support his assertion the investment was debt, were wrong.  Ex. 8, pp. 186-202.

experience in the mortgage industry, after extensive due diligence, provided or committed to provide over $44,000,000 in capital.  Ex. 5; Ex. 11, pp. 89-92; Ex. 1, pp. 181-184, 196-198. Second, approximately three weeks before the Redemption, another sophisticated party executed an agreement to provide WJB with up to $120,000,000 of warehouse financing with full knowledge of the impending Redemption.  Ex. 16, p. 2; Ex. 1, p. 78.  Third, in December 2015 WJB continued to carry out normal operations, originating approximately $151,000,000 in new loans to end-borrowers.  Ex. 17, p. 1.  Fourth, it acquired a new branch that month.  Ex. 10, p. 1.

Glusman attempts to support his contention that WJB should have been treated as in liquidation in December of 2015 by citing to a report prepared by Arch + Beam.  The report dated February 14, 2016, expressed the view that a viable core business no longer existed *as of February 2016*.  Ex. 12, p. 4.  With respect to that conclusion, Glusman stated:

> It is apparent to me that the financial condition of the Company, as considered by Arch + Beam, was largely unchanged since December 31, 2015, and that their conclusions are generally relevant and germane to the condition of the Company after the Repurchase Transaction.

Ex. 14, ¶ 91.  The statement was false on its face.  The very same Arch + Beam report noted that in early January 2016, "…about 30-40% of the Company's revenue was lost when [a mortgage brokerage business] left WJB for a competitor. This was completely unexpected by the Company." Ex. 12, p. 3.  It also noted the high curtailment, described above, as arising from the TRID regulations.  *Id.*

More troubling, Glusman chose to build his analysis on a document that he called the "*2015 Trended Financial Statements*" which was part of the reason he used a liquidation premise of value.  Ex. 8, p. 157.  Glusman characterized this document in his initial report and during his deposition as the most reliable available set of projections and most reliable balance sheet.  Ex. 14,

¶¶ 44-46; Ex. 8, pp. 68-70.[12]  That document reflected that WJB would run out of money by March

2016.  Even superficial analysis revealed the "*2015 Trended Financial Statements*" was neither a

completed balance sheet nor projection, but rather was an excel working file.  The balance sheet

portion was an incomplete draft with estimates, while the income statement and cash flow

statement tabs contained hidden columns that had not been updated.  The "*2015 Trended Financial*

*Statements*" contained an entry that should have occurred one time, in December of 2015, but

instead rippled through month after month, incorrectly reflecting a $4.1 million per month expense

that did not exist.  Ex. 8, pp. 110-111, 132-139.  Without the recurring dummy entry, the financial

data in this excel working file, which Glusman deemed otherwise reliable, would have resulted in

positive cash flow.  Ex. 8, pp. 159-161.  Glusman recognized the error within seconds of being

directed to the tab in his deposition.  Ex. 8, pp. 130-132.

## IV.   ARGUMENT

### A.  The Court Should Use its Gatekeeper Function to Exclude Glusman's Testimony.

"Expert evidence can be both powerful and quite misleading because of the difficulty in

evaluating it."  *Daubert,* 509 U.S. at 595; *see also* Fed. R. Evid. 702, Advisory Committee Note

to 2023 Amendment ("judicial gatekeeping is essential" because "jurors may lack the specialized

knowledge to determine whether the conclusions of an expert go beyond what the expert's basis

and methodology reliably support.").  FRE 702, informed and analyzed by *Daubert* and its

progeny, vests this court with the gatekeeping function of excluding improper expert testimony.

*Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC*, No. 13-CV-324 (RGA), 2017 WL

3528606, at *2 (D. Del. Aug. 16, 2017)*.  The Court should exclude Glusman's opinion as

---

[12] Glusman cites to this document 29 times across his two reports.  Ex. 14, ¶¶ 31, 33, 34, 46, 55, 57, 60, 73, 84; Ex. 18, ¶¶ 14, 17, 18, 23, 26, 107, 119, 133, 136, 138, 163, 164, 170.

unreliable for failures of methodology and reliance on unreliable information, and failure to fit the present case because, among other reasons, it speaks as of the wrong date with respect to solvency and depends upon an incorrect legal directive.

**B.   The Glusman Opinion Does Not Satisfy The Fit Requirement As It Speaks As Of The Wrong Date.**

With respect to the Trustee's fraudulent conveyance claim "[f]or purposes of Section 548, solvency is measured at the time the debtor transferred value, not at some later or earlier time." *In re R.M.L., Inc.*, 92 F.3d 139, 154 (3d Cir. 1996).[13]  Presuming insolvency as of the transfer date based on insolvency at a later date is improper. "'Hindsight bias is to be fought rather than embraced' when determining solvency." *Janssen v. Reschke*, 2020 WL 6044284, at *11 (N.D. Ill. Oct. 13, 2020) (quoting *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 693 (7th Cir. 2010); *see also Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 795 (7th Cir. 2009) ("Whether a transfer was fraudulent when made depends on conditions that existed when it was made, not on what happened later to affect the timing of the company's collapse.").  Courts do permit parties to use a later date's balance sheet to trace insolvency back to the date of the transfer – a process called retrojection – but that tracing must be supported by evidence that the same conditions existed on the date of the transfer; *i.e.* the Trustee must show the financial condition did not change between the transfer date and subsequent date of insolvency.  *See Janssen*, 2020 WL 6044284, at *11 (retrojection inapplicable where debtor's financial condition differed on transfer date).  The Trustee's expert must affirmatively show "…that the debtor's financial situation did not change materially during the intervening period." *In re Indus. Com. Elec., Inc.*, No. 02-45451-JBR, 2004 WL 1354530, at

---

[13] The Delaware Uniform Fraudulent Transfer Act, including Sections 1304-1305, tracks section 548 of the Bankruptcy Code. *In re Autobacs Strauss, Inc.*, 473 B.R. 524, 567 (Bankr. D. Del. 2012).

*7 (Bankr. D. Mass. Apr. 27, 2004); *In re Kaylor Equip. & Rental, Inc.*, 56 B.R. 58, 62 (Bankr. E.D. Tenn. 1985) (trustee did not sustain burden of proving insolvency when evidence showed debtor was insolvent on the petition date but "did not show that there had been no substantial change in the financial condition of the debtor in the period from the transfer to the debtor's bankruptcy filing.").

The "fit" requirement has been articulated as including relevance, "but the standard is higher than bare relevance." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir, 1994); *U.S. v. Ford*, 481 F.3d 215, 219 (3d Cir. 2007). In this case, the Trustee's expert did only a balance sheet analysis to establish insolvency, so the opinion does not "fit" the present case because a balance sheet analysis must be as of the exact date of the challenged transaction to be relevant. *Mellon Bank, N.A. v. Metro Comms., Inc.*, 945 F.2d 635, 649 (3d Cir. 1991). Theoretically, Glusman could have attempted to overcome that difficulty by applying a retrojection analysis, but he did not do so. Indeed, Glusman acknowledges WJB's condition deteriorated between the transaction date and December 31, 2015, and he made no effort to assess or quantify the magnitude of that change. Ex. 8, p. 71. Having failed to properly perform a retrojection analysis, Glusman's opinion as to the solvency of WJB on December 31, 2015 is meaningless to a jury.

The fit problem caused by Glusman's report is what caused the Supreme Court to warn "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595. To a lay jury that might not understand how rapidly matters can change for a business, expert testimony that WJB was insolvent at a date close in time to the Redemption might seem relevant, but the law makes clear it is not. The law on retrojection also makes clear that the Trustee bears the burden of demonstrating insolvency as of the transfer; it is not a leap the trier of fact can make on its own. Glusman's conclusion that WJB was insolvent

13

on December 31, 2015 is defective for multiple reasons, but even if it were a correct conclusion, it is not fit for the present case because it depends on an irrelevant date.

### C. Counsel's Direction that Glusman Should Presume An Improper Legal Conclusion Makes Glusman's Opinion Irrelevant

Glusman repeatedly stated in his report and at deposition that he was directed by counsel to recast the MIMS investment as debt instead of equity, thereby creating a $10,000,000 liability. Ex. 8, pp. 46-49; Ex. 14, ¶¶ 4, 8, 74, and note G to Exhibit 5 thereof.  Without that assumption, Glusman's analysis would have resulted in a finding of solvency.  The legal instruction was clearly wrong and Glusman's dependence on it warrants the exclusion of his opinion.

In the Third Circuit, whether an investment is debt or equity is a factual question, not a legal one.  *See In re SubMicron Sys. Corp.*, 432 F.3d 448, 457 (3d Cir. 2006).  As discussed more fully below, the directive was also wrong because the facts of the MIMS transaction could not be contorted to make MIMS' investment debt.  If this Court is not going to instruct the jury the MIMS transaction should be treated as debt as a matter of law – something *SubMicron* holds this Court ought not do – then Glusman's opinion resting on counsel's directive that the MIMS investment was debt as a matter of law rests on an improper legal presumption.  "An expert's opinion that crucially depends on an incorrect legal theory is not likely to be relevant to the Court's fact-finding. Consequently, courts routinely preclude those portions of an expert's report that are premised on a misunderstanding of the law."  *Exela Pharma Scis., LLC v. Eton Pharms., Inc.*, No. 20-CV-365 (MN), 2022 WL 806524, at *2 (D. Del. Feb. 8, 2022), *citing inter alia Sprint Commc'ns Co. L.P. v. Cox Commc'ns Inc.*, 302 F. Supp. 3d 597, 624 (D. Del. 2017); *see also Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996) ("Incorrect statements of law are no more admissible through 'experts' than are falsifiable scientific theories."); *United States v. Cunningham*, 679 F.3d 355, 380 (6th Cir. 2012) (approving district court's exclusion of expert analysis that conflicted with the

14

court's rulings and applicable law); *Southard v. United Reg'l Health Care Sys., Inc.*, 2008 WL 4489692, at *2 (N.D. Tex. Aug. 5, 2008) ("[W]here as here, the expert's opinion is based on an erroneous legal premise, it is appropriate to exclude such testimony."); *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005) ("Expert opinions that are contrary to law are inadmissible." (citations omitted)).

This Court should not "deviate from this general rule" and should exclude Glusman under Fed. Rule Evid. 702.

### D. Glusman's Testimony Established He Could Not Characterize MIMS' Investment As Debt On Accounting Principles.

To the extent the Trustee attempts to argue Glusman did his own analysis and did not just rely on counsel's instruction, this is contradicted by his report and testimony. Moreover, Glusman's deposition testimony exposes his opinion was based on incorrect facts because Glusman misread or misunderstood the objective transaction documents.

The objective facts of the MIMS transaction, based on a plain reading of the legal documents, would not support any conclusion the MIMS investment was debt. In doing the factual analysis in *SubMicron*, the Third Circuit followed the lead of *Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625, 630 (6th Cir. 1986) and employed many of the criteria articulated in *Roth Steel*, which stated "[t]he determination of whether advances to a corporation are loans or capital contributions depends on whether the objective facts establish an intention to create an unconditional obligation to repay the advances." *Roth Steel,* 800 F.2d at 630.[14]   In the present case, where return was

---

[14] *Roth Steel* set out the following criteria: (1) "The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans"; (2) "[t]he absence of a fixed maturity date and a fixed obligation to repay indicates that the advances were capital contributions and not loans"; (3) "[t]he absence of a fixed rate of interest and interest payments is a strong indication that the advances were capital contributions rather than loans"; (4) "if the expectation of repayment depends solely on the success of the borrower's business, the

15

dependent on the business's success, no such unconditional obligation existed.  Indeed, none of the *Roth Steel* factors support a conclusion that MIMS' investment was debt.

DeMoulas is not filing this motion just because the competing experts have differing views of the facts, but rather because Glusman himself admitted the facts he would have relied upon to make an assessment of MIMS' investment (if counsel had not directed him to presume MIMS was debt) have no support in the record.  As one claimed hallmark of debt, Glusman's report incorrectly states the funds MIMS invested in the limited partnership were secured by collateral.  Ex. 14, ¶¶ 66, 72, 79.  In his deposition, Glusman acknowledged this was not the case and that no security was issued to MIMS.  Ex. 8, pp. 186-187.  In his report, Glusman justified his conclusion that there was collateral for the MIMS investment on a bankruptcy claim he said had been filed by MIMS. Ex. 14, ¶ 66.  When shown the bankruptcy claims in his deposition, he acknowledged it was not filed by MIMS and was not for this investment.  Ex. 8, pp. 66-67.  In his report, to justify the debt claim, Glusman said:

> In return for such contributions, MIMS could expect to effectively receive back its principal plus a component of interest. The *Restated LPA Agreements* afforded MIMS required distributions, including a "Preferred Return" and return of contributions, equivalent to interest and principal, respectively.

---

transaction has the appearance of a capital contribution"; (5) "[t]he adequacy or inadequacy of capitalization - "advances made to a corporation whose debt to equity ratio exceeds 300 to 1 are indicative of venture capital rather than loans." (Glusman said the ratio was 15:1, Ex. 14, ¶ 26); (6) "[t]he absence of security for the advances is a strong indication that the advances were capital contribution rather than loans"; (7) "the corporation's ability to obtain financing from outside lending institutions is an indication of capital" (WJB simultaneously did obtain other financing, *See* Ex. 5); (8) "[s]ubordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans."; (9) "[u]se of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness"; (10) "[t]he failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans." *Roth Steel*, 800 F.2d at 630-632.

Ex. 14, ¶ 71.  In his deposition, however, Glusman again acknowledged that MIMS would get a return on its investment, including the so-called preferred return, only if the business was successful and that feature "is the quintessential definition of equity." Ex. 8, pp. 194-195.  He said he relied on a provision of the partnership agreement that provided for MIMS to get its money back in 180 days but could not point to any such provision during his deposition.  Ex. 8, pp. 189, 191-193.  He acknowledged that final distribution depended on the success of the business.  Ex. 8, p. 199.  He acknowledged that a limited partnership investment was typically equity, Ex. 8, p. 58, and that the MIMS documents had none of the traditional features of debt instruments.  Ex. 8, pp. 197-199.

"[E]xpert testimony based on assumptions lacking factual foundation in the record is properly excluded." *Meadows v. Anchor Longwall and Rebuild, Inc.,* 306 F. App'x 781, 790 (3d Cir. 2009), citing *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002).  Because the recharacterizing of the MIMS investment as debt was wrong – a key piece of Glusman's opinion – his testimony should be excluded as not reliable.  "'[A]ny step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible…'". *In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 858 F.3d 787, 800 (3d Cir. 2017).  Glusman opines on an entity with a debt of $10,000,000 to MIMS instead of an equity investment, making his analysis irrelevant and not fit for the case before the court.  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 739 (must be relevant).

### E.  Glusman's Balance Sheet Analysis Is Rendered Unreliable by Methodology Flaws.

Contrary to clear Third Circuit precedent, Glusman improperly applied the liquidation premise of value instead of valuing WJB as a going concern.  The Third Circuit law holds that when bankruptcy is not "clearly imminent" on the date of the challenged conveyance, the assets

17

are valued on a going concern basis.  *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1067 (3d Cir. 1992); *see also In re Trans World Airlines, Inc.*, 134 F.3d 188, 193 (3d Cir. 1998) ("Because liquidation in bankruptcy was not clearly imminent on the date of the challenged transfer, we concern ourselves with how to achieve a fair valuation of TWA's assets on a 'going concern' basis."); *In re Taxman Clothing Co.,* 905 F.2d 166, 169–70 (7th Cir. 1990) (under the Bankruptcy Code going concern valuation is proper unless "business is on its deathbed"); *In re Am. Classic Voyages Co.*, 2007 WL 1237828, at *6 (Bankr. D. Del. Apr. 27, 2007) ("Before the going concern valuation is to be abandoned the business must be 'wholly inoperative, defunct or dead on its feet.'")  (internal citations omitted); *In re Bellanca Aircraft Corp.*, 56 B.R. 339, 387 (D. Minn. 1985) ("If business is in fact being conducted at the relevant time, though, then its assets must be valued, not as isolated articles separated from the whole, but as parts of the whole and as useful in that relationship.  Only where a business is wholly inoperative, defunct, or dead on its feet, will going concern valuation be abandoned in favor of an item-by-item fair market valuation.").

The *Bellanca* court's observation that "the assets must be valued . . . as parts of the whole and as useful in that relationship" goes to a key difference between a going concern valuation and a liquidation one.  As Glusman acknowledges, "[t]he value of business assets in a going concern is the present value of cash flows those assets can generate into the future."[15]  The difference between the value of the assets less liabilities, and the true value of a company based on its capacity to generate revenue is goodwill, an intangible asset.  Ex. 15, pp. 4-5.; Ex. 8, pp. 156-157.  To do a proper solvency analysis on a going concern basis, the expert must do a valuation to determine whether there is goodwill, and in what amount.  *See* Ex. 8, pp. 154-157.  The ultimate teaching of

---

[15]  Ex. 14, ¶ 24, *citing The Comprehensive Guide to Economic Damages.*

*Moody*, and the cases that followed it is not that there must be goodwill when the going concern premise of value is employed, but absent the subject company being "on its death bed" at the time of the challenged transaction the expert assessing solvency must do the work to determine whether there is goodwill and in what amount.  Because he chose a liquidation premise, Glusman improperly reduced goodwill to zero.

Glusman's liquidation conclusion is indefensible.  Business was "in fact being conducted" by WJB on the date of the Redemption, on December 31, 2015, and, until March, 2016 when it succumbed to intervening events that were not on the horizon at the time of the Redemption.  On December 9, 2015, WJB received cash or commitments for approximately $44,000,000.  Of that amount, over $15,000,000 were to be available for post-closing draw downs.  WJB had procured a commitment for $120,000,000 from a warehouse lender in November 2015.  Sophisticated investors had spoken with their pocketbooks and declared WJB a going concern in December of 2015.  The controlling authority does not allow Glusman to brush that all aside.

Glusman supported his conclusion that WJB was "dead on its feet" on December 31, 2015 first by reliance on a document he conceded in his deposition to be unreliable and by cherry picking from another document that, when fully considered, undermined his conclusion.  The unreliable document was the "*2015 Trended Financial Statements*" which proved to be not a balance sheet and projections at all, as he claimed, but rather a work in progress template riddled with obvious, major errors.  The document he cherry picked from was the Arch + Beam report, which made findings as of February 14, 2016.  Glusman supported his conclusions by saying nothing had changed between the Redemption and the date of the Arch + Beam report, when the report on its face showed that statement was false.  "[A]ny step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible."  *In re Zoloft,* 858 F.3d at 800.

19

Because Glusman's use of a liquidation premise of value is indefensible and depends entirely upon facially unreliable information, his opinion as a whole is unreliable and should be excluded.

## V.    CONCLUSION

Glusman's opinion fails to meet the "fit" requirement of *Daubert* and FRE 702 because it is based on an irrelevant date and it assumes a debtor that had a debt obligation to MIMS rather than an equity investment from it.  It is unreliable for its improper casting of the MIMS investment as debt and because it is built on a faulty assumption directed by counsel.  It is also unreliable in that it uses the wrong premise of value and relied on a document riddled with errors.  This Court should exercise its gatekeeper function and preclude Glusman from testifying.

**DAVIS, MALM & D'AGOSTINE, P.C.**
Gary S. Matsko (admitted *pro hac vice*)
Christopher J. Marino (admitted *pro hac vice*)
Taylor P. Lovejoy (admitted *pro hac vice*)
One Boston Place, 37th Floor
Boston, MA 02108
(617) 367-2500
gmatsko@davismalm.com
cmarino@davismalm.com
tlovejoy@davismalm.com

Dated:  May 13, 2024

**YOUNG CONAWAY STARGATT
    & TAYLOR, LLP**

 */s/ Michael S. Neiburg*
Michael S. Neiburg (No. 5275)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302)576-3590
mneiburg@ycst.com
rvrana@ycst.com

*Counsel for Arthur S. DeMoulas, ASD
Merchant Partners LLC, Arthur S. DeMoulas
Continuation Trust, and Arthur S. DeMoulas
2012 Trust*

31643809